**NEUBERGER BERMAN REAL ESTATE INCOME FUND, INC., Plaintiff,**

v.

**LOLA BROWN TRUST NO. 1B, Ernest Horejsi Trust No. 1B, Badlands Trust Company, Susan L. Ciciora, Larry L. Dunlap, and Stewart R. Horejsi, Defendants.**

No. CIV. AMD 04–3056.

United States District Court, D. Maryland.

Dec. 14, 2004.

David Clarke, Jr., Piper, Rudnick, LLP, Reston, VA, Daniel M. Perry, Michael L. Hirschfeld, Stacey J. Rappaport, Milbank, Tweed, Hadley and McCloy LLP, New York, NY, John R. Wellschlager, Piper, Rudnick LLP, Baltimore, MD, for Plaintiff.

Donald B. Mitchell, Jr., James H. Hulme, Kate Bowen Briscoe, Arent, Fox, Kintner, Plotkin and Kahn PLLC, Washington, DC, for Defendants.

## MEMORANDUM OPINION

DAVIS, District Judge.

Now pending in this securities case is defendants/counterclaimants' motion for certification of final judgment of the court's declaratory judgment order of October 22, 2004, pursuant to Federal Rule of Civil Procedure 54(b). The issues have been fully briefed and no hearing is necessary. *See* Local Rule 105.6 (D.Md.2004). For the reasons stated herein, I shall grant the motion.

### I. Background

On September 10, 2004, Lola Brown Trust No. 1B and Ernest Horejsi Trust No. 1B (collectively, "the Trusts") commenced a partial tender offer to effect the acquisition of just over 50% of the outstanding shares of Neuberger Berman Real Estate Income Fund, Inc. ("NRL"), a closed-end investment company governed by the Investment Company Act of 1940 (the "1940 Act"), 15 U.S.C. § 80a–1 *et seq.* Subsequently, the board of NRL undertook several defensive actions, including the adoption of a poison pill and a resolution electing NRL to be subject to the Maryland Control Share Acquisition Act ("MCSAA"), Md.Code Ann., Corps. & Ass'ns § 3–701 *et seq.* (2003).[1]

NRL initiated the instant suit by filing a complaint against the Trusts, among others, alleging violations of § 14(e) of the Securities and Exchange Act of 1934 (hereinafter, the "Exchange Act"), 15 U.S.C. § 78n(e), with respect to the Trusts' tender offer.[2] On October 6, 2004, the Trusts filed a counterclaim containing six claims for declaratory relief—three claims each as to NRL's poison pill and

the applicability of voting restrictions imposed upon "control shares" in the MCSAA to any shares owned by the Trusts—as well as three other claims (for tortious interference with prospective business, violation of § 14(e) of the Exchange Act, and violation of 17 C.F.R. § 240.14e–3(a), and (d)). At the same time, the Trusts moved for expedited consideration of their six claims for declaratory judgment pertaining to the poison pill and the MCSAA.

I held a hearing on the Trusts' motion for declaratory judgment on October 13, 2004. In an order dated October 22, 2004, and accompanying amended memorandum opinion dated October 28, 2004, I concluded that the poison pill does not violate §§ 18(d), 18(i), and 23(b) of the 1940 Act. Moreover, although I offered several observations on the state law question while pointing out the evident weakness of NRL's contentions, I declined formally to decide whether voting restrictions imposed upon "control shares" in the MCSAA would apply to control shares acquired by the Trusts, as counsel for the Trusts had conceded at the hearing that the tender offer would not proceed unless the Trusts prevailed on the state law issues *and* the poison pill was declared illegal.

### II. Analysis

Rule 54(b) provides a vehicle by which a district court can certify for immediate appeal a judgment that disposes of fewer than all of the claims in a multiple-claims action or resolves the controversy as to fewer than all of the parties. Rule 54(b) provides in relevant part:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer

**1.** For a more detailed discussion of the facts, see *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B et al.,* 342 F.Supp.2d 371, 373–75 (D.Md.2004).

**2.** Section 14(e) of the Exchange Act provides, in pertinent part, that:
> It shall be unlawful for any person to make any untrue statement of a material fact or omit to

> state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . .

15 U.S.C. § 78n(e).

than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

■ The district court must satisfy two steps in the process of a Rule 54(b) certification. *Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 7–8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). As a threshold matter, the court must determine whether the judgment is "'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Id.* at 7, 100 S.Ct. 1460 (quoting *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 436, 76 S.Ct. 895, 100 L.Ed. 1297 (1956)). Second, the court must ascertain whether there is any just reason for delay. *Id.* at 8, 100 S.Ct. 1460. In determining whether there are any just reasons for delay, the court must exercise its discretion "'in the interest of sound judicial administration'" and consider the equities involved. *Id.* (quoting *Mackey,* 351 U.S. at 437, 76 S.Ct. 895). Factors the court should consider, if applicable, include:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Braswell Shipyards, Inc. v. Beazer East, Inc.,* 2 F.3d 1331, 1335–36 (4th Cir.1993) (quoting *Allis–Chalmers Corp. v. Philadelphia Electric Co.,* 521 F.2d 360, 364 (3d Cir.1975) (footnotes omitted)); *see also Curtiss–Wright,* 446 U.S. at 8, 100 S.Ct. 1460 ("whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals").

■ The court's role is "to act as a 'dispatcher,'" and "[i]t is left to the sound judicial discretion of the district court to determine the 'appropriate time' when each final decision in a multiple claims action is ready for appeal." *Id.* (quoting *Mackey,* 351 U.S. at 435, 76 S.Ct. 895). The Supreme Court has clarified that a party seeking certification need not prove danger of hardship or injustice through delay in the entry of judgment and that certification is not only appropriate in the "infrequent harsh case." *Id.* at 9–10, 100 S.Ct. 1460.

■ My declaratory judgment order with respect to the poison pill claims constitutes a "final" judgment because it is an ultimate disposition of those claims. The three counts in the Trusts' counterclaim pertaining to the poison pill sought no other relief than a declaration that the poison pill was illegal, and therefore the October order finding that the poison pill was a lawful maneuver finished the litigation on the merits of the poison pill claims.

■ I now turn to the judicial administrative interests and equitable factors relevant to a determination of whether there is any just reason for delay in the entry of judgment. An evaluation of the interrelationship or separability of the adjudicated and unadjudicated claims is of paramount importance in this analysis. I find that the poison pill claims under review are entirely separable from the remaining claims such that the Fourth Circuit would not have to decide the same issues more than once even if there were subsequent appeals.

Resolution of the poison pill claims turns on whether NRL's poison pill violates any of three provisions of the 1940 Act. The remaining claims present completely separate legal questions. Those questions are the following: (1) whether the voting restrictions of § 3–702(a) of the MCSAA apply to the Trusts; (2) whether the MCSAA is preempted by § 18(i) of the 1940 Act; (3) whether the resolution of the board of NRL opting in to the MCSAA violates NRL's Charter; (4) whether NRL's adoption of the poison pill and opt-in to the MCSAA constitute tortious activity; (5) whether NRL and its interested

directors communicated material nonpublic information relating to a tender offer in violation of Securities and Exchange Commission ("SEC") rules; (6) whether the Trusts made false statements or omissions in connection with a tender offer in violation of § 14(e) of the Exchange Act; (7) whether defendants Dunlap, Ciciora, and Horejsi caused the Trusts to make misleading statements and omissions in the tender offer; (8) whether NRL made false statements or omissions in connection with a self tender offer in violation of § 14(e) of the Exchange Act; and (9) whether each of the Trust defendants and/or a group including the Trusts and other entities constitutes an "investment company," which, under the 1940 Act, is prohibited from owning more than 3% of the shares of another investment company and therefore would be prevented from consummating the tender offer. That NRL invokes § 18(i) of the 1940 Act in two separate counts—namely, whether § 18(i) preempts the MCSAA and whether the poison pill violates § 18(i)—does not mean that those claims are not sufficiently distinct.

Undeniably, NRL's claim and the Trusts' counterclaims arise out of the same set of occurrences—the Trusts' tender offer and NRL's responses thereto. Nevertheless, the adjudicated poison pill claims and the remainder of the claims involve different questions of law. If the Fourth Circuit were to be faced with a subsequent appeal in this case, that Court would not be required to revisit the legality of the poison pill. *See Curtiss–Wright,* 446 U.S. at 8, 100 S.Ct. 1460 (stating that the trial court properly considered in a Rule 54(b) analysis "whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once *even if there were subsequent appeals*") (emphasis added).

Certification is especially appropriate in the instant case because appellate resolution of the poison pill issue could effectively eliminate further proceedings in this case, and thereby conserve judicial resources. *See*

*Curtiss–Wright,* 446 U.S. at 8, 100 S.Ct. 1460 n.2 (stating that certification may be appropriate where "appellate resolution of the certified claims would facilitate a settlement of the remainder of the claims"); *State of New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1426 (2d Cir.1991) (holding that district court was within its discretion to certify where a resolution of the certified issues would "likely assist in the resolution or settlement of" the rest of the case); *Alcan Aluminum Corp. v. Carlsberg Fin. Corp.,* 689 F.2d 815, 817 (9th Cir.1982) (finding certification appropriate where "[i]t may facilitate settlement of the remaining claims ... and it may well aid the expeditious decision of those claims if they are not settled"); *see also Fox v. Baltimore City Police Dept.,* 201 F.3d 526, 532 (4th Cir.2000) (holding that district court did not abuse its discretion in certifying its judgment as final where resolution on appeal "will streamline the resolution of" the remaining claims). If the Fourth Circuit upholds this court's declaratory judgment, the Trusts' tender offer will not proceed.[3] NRL's claims for injunctive relief in connection with alleged misstatements and omissions in the Trusts' tender offer therefore will be moot. With the tender offer eliminated, this court also would not need to decide any of the Trusts' counterclaims in connection with the MCSAA or rule on NRL's assertion that § 12(d) of the 1940 Act prohibits the Trusts from owning more than 3% of NRL's outstanding shares. There is a significant possibility that all of the remaining counterclaims, which address NRL's responses to the Trusts' tender offer, would settle.

Even though a reversal as to the poison pill issue would not moot the remaining claims in this case, it is likely that a reversal would serve the interests of judicial economy by encouraging settlement of those claims. Without ruling on the MCSAA claims, I have made clear my view that the Trusts' arguments that the voting restrictions of the MCSAA are inapplicable to them are more persuasive than NRL's arguments to the

---

**3.** In the October 4, 2004, Supplement to the Trusts' Offer to Purchase, the Trusts acknowledged, referring to the poison pill and NRL's opt-in to the MCSAA: "We do not expect to accept for purchase the shares tendered in this offer if we are not successful in obtaining a court ruling against NRL on these issues."

contrary. *See Neuberger Berman*, 342 F.Supp.2d 371, 377–78. NRL's "fuller exposition of the legislative history" of the statute in its brief in opposition to the Trusts' motion for entry of final judgment does little to convince me that the Trusts are not exempt from the MCSAA's voting restrictions.

An assessment of the equities also weighs in favor of certification. If the Fourth Circuit were to invalidate the poison pill, the Trusts should not have to wait until after litigation of its remaining claims to obtain relief on that issue. Delay in realizing a reversal on the poison pill issue would be prejudicial to the Trusts by preventing the Trusts' tender offer from proceeding in a timely fashion. Timing is critical in the tender offer context, and such a delay would deprive the Trusts of a unique business opportunity. *See Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 853 (1st Cir.1988) ("[i]t is obvious that timing is everything with tender offers, and ... a delay [of at least one year] would effectively kill the takeover bid in its present form").

Finally, the novelty of the legal question to be certified weighs in favor of certification. *See Int'l Union of Elec., Radio and Machine Workers, AFL–CIO–CLC v. Westinghouse Elec. Corp.*, 631 F.2d 1094, 1099 (3d Cir.1980) (that the claim involved a "novel issue" which was "likely to recur" was a factor in favor of certification). The legality of a poison pill as an anti-takeover strategy used by a closed-end investment company is an issue of first impression. *See* Angela Pruitt, *New Ground Won by a Closed Fund*, The Wall Street Journal, Oct. 25, 2004, at C17 ("While corporations commonly use poison pills, such a strategy hadn't been tested by closed-end funds").

Upon weighing the equities and considering the interests of judicial administration and judicial economy, I find that certification is appropriate in this case. The separability of the claims, the novelty of the poison pill issue, and the potential for immediate appellate review of the poison pill issue to resolve this case in its entirety, tilt the balance in favor of certification.

### III. Conclusion

For the reasons stated above, the motion to enter final judgment pursuant to Rule 54(b) shall be granted. An Order follows.