*Saba Cap. CEF Opportunities 1, Ltd., Saba Cap. Mgmt., L.P. v. Nuveen Floating Rate Income Fund, et al.*

In the
# United States Court of Appeals
## For the Second Circuit

————————

August Term 2022

(Argued: May 24, 2023 | Decided: November 30, 2023)

Docket No. 22-407

SABA CAPITAL CEF OPPORTUNITIES 1, LTD.,
SABA CAPITAL MANAGEMENT, L.P.,

*Plaintiffs-Appellees,*

v.

NUVEEN FLOATING RATE INCOME FUND, NUVEEN FLOATING RATE INCOME
OPPORTUNITY FUND, NUVEEN SHORT DURATION CREDIT OPPORTUNITIES FUND,
NUVEEN GLOBAL HIGH INCOME FUND, AND NUVEEN SENIOR INCOME FUND; AND
TERENCE J. TOTH, JACK B. EVANS, WILLIAM C. HUNTER, ALBIN F. MOSCHNER, JOHN
K. NELSON, JUDITH M. STOCKDALE, CAROLE E. STONE, MARGARET L. WOLFF,
ROBERT L. YOUNG, AND MATTHEW THORNTON, III, IN THEIR CAPACITY AS TRUSTEES
OF THE NUVEEN TRUSTS,

*Defendants-Appellants.*[†]

————————

---

[†] The Clerk of the Court is directed to amend the official caption as set forth above.

Before:

WESLEY and PARK, <em>Circuit Judges.</em>*

Defendants-Appellants Nuveen Floating Rate Income Fund, Nuveen Floating Rate Income Opportunity Fund, Nuveen Short Duration Credit Opportunities Fund, Nuveen Global High Income Fund, Nuveen Senior Income Fund, and their trustees (collectively, "Nuveen") appeal from a final judgment entered in favor of Plaintiffs-Appellees Saba Capital CEF Opportunities 1, Ltd. and Saba Capital Management, L.P. (collectively, "Saba"). The United States District Court for the Southern District of New York (Oetken, *J.*) granted summary judgment for Saba, declaring unlawful and rescinding an amendment to Nuveen's investment company bylaws that restricts shareholders from voting shares acquired above specified levels of ownership.

On appeal, Nuveen challenges Saba's Article III standing and the district court's judgment with respect to the legality of Nuveen's amendment. Nuveen argues that Saba lacks standing because Saba has not alleged, or supported with evidence, an actual or imminent injury that is concrete. On the merits, Nuveen argues that its amendment does not violate the Investment Company Act of 1940 because it is a restriction on shareholders, not shares. We disagree on both issues. Accordingly, we **AFFIRM** the judgment of the district court.

_____

> SHAY DVORETZKY, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC (Parker Rider-Longmaid, Kyser Blakely, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC; Scott Musoff, Boris Bershteyn, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY; Eben Colby, Emily Jennings, Skadden, Arps, Slate, Meagher & Flom LLP, Boston, MA, *on the brief*), *for Defendants-Appellants* Nuveen Floating Rate Income Fund, Nuveen Floating Rate Income Opportunity Fund,

---

* Circuit Judge Rosemary S. Pooler, originally a member of the panel, died on August 10, 2023. The two remaining members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b).

Nuveen Short Duration Credit Opportunities Fund, Nuveen Global High Income Fund, and Nuveen Senior Income Fund.

Robert A. Skinner, Douglas Hallward-Driemeier, Amy D. Roy, Ropes & Gray LLP, Boston, MA, *for Defendants-Appellants* Terence J. Toth, Jack B. Evans, William C. Hunter, Albin F. Moschner, John K. Nelson, Judith M. Stockdale, Carole E. Stone, Margaret L. Wolff, Robert L. Young, and Matthew Thornton III, in their capacity as Trustees of the Nuveen Trusts.

MARK P. MUSICO, Susman Godfrey LLP, New York, NY (Jacob W. Buchdahl, Susman Godfrey LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellees*.

Susan Olson, Dorothy Donohue, Kenneth Fang, The Investment Company Institute, Washington, DC; Steven A. Engel, David A. Kotler, Michael H. McGinley, Dechert LLP, New York, NY, for *Amicus Curiae* The Investment Company Institute in Support of *Defendants-Appellants*.

Aaron T. Morris, Andrew W. Robertson, Morris Kandinov LLP, New York, NY, for *Amicus Curiae* Bulldog Investors, LLP in Support of *Plaintiffs-Appellees*.

_____

WESLEY, *Circuit Judge*:

The Investment Company Act of 1940 ("ICA") requires that every share of common stock issued by a registered investment company must be a voting stock and have equal voting rights with all other shares. The question in this case is whether Nuveen violated the ICA by adopting an amendment to its bylaws that

3

restricts shareholders in certain of its closed-end investment funds from voting shares acquired above specified levels of ownership. We hold that this voting restriction violates the ICA.

## BACKGROUND

A mutual fund is "a pool of assets . . . belonging to the individual investors holding shares in the fund," and is operated by an "investment company," consisting of directors elected by the fund's shareholders. *Chamber of Com. of the U.S. v. Sec. & Exch. Comm'n*, 412 F.3d 133, 136 (D.C. Cir. 2005) (citation omitted). Investment funds are either "open-ended" or "closed-ended." Nuveen, the Appellants here, are a collection of closed-end investment funds.

The primary difference between closed-end funds and open-end funds is that, unlike open-end funds, closed-end funds are not required to buy back (*i.e.*, "redeem") shares from their shareholders. This affords closed-end funds more leeway in deciding where to invest their funds' assets. Because closed-end funds need not maintain deep cash reserves or sell their securities to honor shareholders' redemptions, they can invest in less liquid securities, like municipal bonds or debt instruments. Nuveen contends that closed-end funds are especially attractive to individuals closer to retirement because they provide steady dividends.

4

There is another important difference between open-end and closed-end funds: they are valued differently. Shares of open-end funds can be sold back to the fund at any time at a price based on the fund's current net asset value or NAV (the total value of the fund's underlying assets minus its liabilities). A closed-end fund's share price, however, can fluctuate based on the amount an investor is willing to pay for that share on the open market. Thus, closed-end funds can trade at prices significantly below or above their NAV per share.

That is where Appellees come in. Saba refers to itself as a group of "activist" investors who invest in funds that trade at discounts relative to their NAVs. Saba's business strategy involves buying voting shares in discounted funds, and then monetizing those discounts by, for example, electing new boards of directors, advocating for measures authorizing the buyback of shares at or near NAV, and/or converting funds to open-end structures. Nuveen describes Saba's investment practices with little affection, accusing Saba of past deeds of depleting other funds' assets and altering investment strategies away from long-term investments, all to turn a "quick profit." Appellants' Br. at 3, 17.

Nuveen's closed-end funds trade below their NAVs. "Seeing an opportunity," Saba began accumulating positions in the Nuveen funds[1] in December 2018, increasing its shares in the funds over the next two years. Appellees' Br. at 9. By the end of 2020, Saba was the beneficial owner of *at least* 9.9% of each of the Nuveen fund's outstanding shares, owning as much as 12% in one of the funds.

As Saba was increasing its shares in the Nuveen funds, Nuveen adopted Amended and Restated Bylaws in October 2020. The Amended Bylaws included a Control Share Amendment (the "Amendment") that limited the ability of shareholders with holdings greater than 10% in any particular fund, like Saba, to vote any additional shares purchased.

The thrust of the Amendment is to limit the influence of larger investors like Saba. It works as follows: the Amendment is triggered when a shareholder acquires a number of shares that, when added to all of their other shares, would entitle the shareholder to an identified percentage of the fund's voting power.

---

[1] When it filed suit, Saba held 11.7% of the shares of Nuveen Floating Rate Income Fund ("JFR"); between 10.2% and 11.1% of the shares of Nuveen Floating Rate Income Opportunity Fund ("JRO"); 12.0% of the shares of Nuveen Short Duration Credit Opportunities Fund ("JSD"); 9.9% of the shares of Nuveen Global High Income Fund ("JGH"); and 9.9% of the shares of Nuveen Senior Income Fund ("NSL").

6

Whenever a Nuveen shareholder buys additional shares beyond the trigger level—the lowest level being 10%—that shareholder has made a "Control Share Acquisition" and can vote those additional shares ("control shares") only to the extent **authorized by a vote of the other shareholders**.[2] Unless the other shareholders authorize the investor to vote those control shares, the investor "shall not be 'entitled to vote' such [c]ommon [s]hares and such [c]ommon [s]hares held by such beneficial owner shall not be entitled to vote." JA 320. The Amendment is at the heart of the appeal.

Saba and Nuveen, with not surprisingly different perspectives, agree that the Amendment's function is to limit the influence of large investors. According to Nuveen, its Amendment was "primarily intended to . . . limit[] the risk that the [f]und will become subject to undue influence by opportunistic traders pursuing short-term agendas adverse to the best interests of the [f]und and its long term shareholders." JA 723. Saba responds that Nuveen is engaging in "scare-mongering" and maintains that Nuveen passed the Amendment "to entrench

---

[2] Section 9.4 of the Amended Bylaws states that the authorization of voting rights "shall require the affirmative vote of the holders of a majority of all of the [s]hares entitled to vote generally in the election of [t]rustees, excluding [i]nterested [s]hares." Joint Appendix ("JA") 320.

7

incumbent management" and to protect management's interests in light of Nuveen's "chronic underperformance." Appellees' Br. at 8, 10.

Saba sued Nuveen. In its complaint, Saba alleged that the Amendment violates the ICA, which requires that every share of common stock issued by a regulated fund be "voting stock" and "have equal voting rights" with other shares. *See* 15 U.S.C. § 80a-18(i). Saba sought (i) rescission of the Control Share Amendment under the ICA and (ii) a declaratory judgment that the Amendment is unlawful. Nuveen moved to dismiss, arguing that the Amendment did not take voting rights away from *shares*, but rather, from *individual shareholders*.[3] Saba opposed that motion and moved for summary judgment.

The district court agreed with Saba that the Amendment violates the ICA, entered a declaratory judgment for Saba, and ordered recission of the Amendment. Rejecting Nuveen's share-shareholder distinction, the court

---

[3] Nuveen argued below that Saba's declaratory judgment claim was improper because the complaint alleged no "actual controversy" under 28 U.S.C. § 2201. Nuveen did not raise this issue on appeal, but now argues that the district court lacked jurisdiction under Article III as Saba does not have standing to sue. We consider Nuveen's standing argument now because we have "an independent obligation to examine [our] own jurisdiction" and "we must always address questions of standing, even when neither the parties nor the court below have considered the issue." *Hu v. City of New York*, 927 F.3d 81, 89 (2d Cir. 2019) (citation omitted).

8

reasoned, in part, that because the ICA defines "voting security" as "any security *presently* entitling the owner or holder thereof to vote," the Amendment violated the ICA because any newly acquired control shares would not "presently entitle" the owner to vote them unless authorized by other shareholders. Special Appendix ("SA") 5 (citing 15 U.S.C. § 80a-2(a)(42)) (emphasis added). Nuveen appealed.

## DISCUSSION

This appeal presents a threshold question of Article III standing: whether Saba has established an imminent and concrete injury when it has been deterred from acquiring additional shares of Nuveen funds and doing so would trigger the Amendment disallowing Saba from voting the newly acquired shares. There is also a secondary question of statutory interpretation: does the Amendment violate the ICA's requirement that all Nuveen shares be "voting stock" with equal voting rights? We affirm the district court's judgment.[4] Saba has standing under Article III, and Nuveen's Amendment violates the ICA's voting provisions.

---

[4] Both questions present issues of law which we review anew. *See Saleh v. Sulka Trading Ltd.*, 957 F.3d 348, 353 (2d Cir. 2020); *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013).

9

## I. Standing

"The Constitution limits federal courts to deciding 'Cases' and 'Controversies.'" *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 296 (2022) (quoting U.S. Const. art. III, § 2). To establish Article III standing, "a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). This appeal focuses on the injury-in-fact requirement.

Nuveen contends that Saba's injury is neither imminent nor concrete. *First*, Nuveen says Saba's injury—that Saba will not be able to vote newly acquired control shares after purchasing them—is speculative because it turns on a chain of possibilities that might never occur. Despite Saba's millions of shares in Nuveen's funds, Saba has not yet made a Control Share Acquisition; Nuveen's shareholders therefore have not been asked to decide whether Saba may vote its future shares. Though Saba had already surpassed the 10% ownership threshold in some of Nuveen's funds before Nuveen passed its Amendment, the Amendment did not affect Saba's ability to vote those pre-Amendment shares. According to Nuveen,

Saba cannot allege an injury in fact until (i) Saba makes a Control Share Acquisition (*i.e.*, buys additional shares taking it above one of the specified percentages in the Amendment); (ii) the shareholders are asked to decide whether Saba can vote its control shares; and (iii) the shareholders **actually** prevent Saba from voting its control shares.

*Second*, Nuveen argues that even if Saba's alleged injury is imminent, it "is not concrete" because "[t]here is no common-law or historical analogue for vindicating Saba's alleged injury." Appellants' Br. at 32.

We disagree: Saba's injury is sufficiently imminent and concrete to satisfy Article III's jurisdictional requirements.

## A. Imminence

Saba's injury is imminent and not speculative. When an Article III injury hinges on a party's intent to take some future action, the Constitution requires more than mere "some day intentions." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (internal quotations omitted). A plaintiff's "few words of general intent," without substantial evidence of plans, "do not support a finding of [an] 'actual or imminent' injury." *Carney v. Adams*, 141 S. Ct. 493, 501–02 (2020); *Defs. of Wildlife*, 504 U.S. at 564. This analysis is "highly fact-specific." *Carney*, 141 S. Ct. at 501–02.

11

As the party invoking federal jurisdiction, Saba bears the burden at the summary judgment stage to "'set forth' by affidavit or other evidence 'specific facts'" establishing its standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (quoting *Defs. of Wildlife*, 504 U.S. at 561).

That said, the standing requirement "do[es] not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Clapper*, 568 U.S. at 414 n.5. Rather, an allegation of future injury is sufficient where the threatened injury is "'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted) (quoting *Clapper*, 568 U.S. at 414 n.5).

Saba contends that it faces the imminent injury of being unable to vote any additional shares it purchases in the Nuveen funds. We agree. Saba's injury is imminent because Saba has established (i) a pattern of increasing its ownership in the Nuveen funds for over a two-year period before the Amendment, at levels sufficient to trigger the Amendment; (ii) an intent to purchase additional shares in the Nuveen funds but for the Amendment, and (iii) that the Amendment would

automatically be triggered to limit Saba's voting rights immediately after purchasing additional shares.

At the outset, Saba's verified complaint affirms that Saba would have acquired additional shares in Nuveen's funds but for the Amendment, and that the Amendment prevented Saba from acquiring additional voting shares in Nuveen's funds.[5]

For over two years before the Amendment passed, Saba steadily increased its ownership in Nuveen's funds. Saba bought shares by the millions and regularly exceeded the 10% threshold in many of Nuveen's funds before the Amendment passed. By the end of 2020 when Nuveen passed the Amendment, Saba was the beneficial owner of *at least* 9.9% of each of the Nuveen fund's outstanding shares. In one Nuveen fund, Saba owned as much as 12% of the outstanding shares; the next share it purchased in that fund would trigger the Amendment.

---

[5] Saba's Portfolio Manager affirmed the allegations of the verified complaint. These sworn statements have the evidentiary weight of an affidavit for purposes of summary judgment. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), *abrogated on other grounds by Tangreti v. Bachmann*, 983 F.3d 609, 617–18 & n.4 (2d Cir. 2020).

Saba informed Nuveen that the Amendment frustrated Saba's future investment plans. Following passage of the Amendment, Saba sent a letter to Nuveen's Board of Trustees demanding its rescission, arguing that it inflicted irreparable harm on Saba. Saba explicitly noted that any future acquired shares would be stripped of voting rights should the Amendment stand. Nuveen refused.

Nuveen's complaints about Saba's motives have within them an implicit concession regarding Saba's intentions. As Nuveen alleges, Saba's business plan is to "gain disproportionate control over funds by acquiring concentrated blocks of shares," and that "*Saba did that here*" by "drastically increasing its holdings in the Nuveen funds over a short period" before Nuveen shut the door. Appellants' Br. at 53 (emphasis added).[6] From Nuveen's perspective, it passed the Amendment to limit "the risk that the [f]und will become subject to undue

---

[6] There is evidence that Saba took similar actions with respect to other non-Nuveen funds before Nuveen passed the Amendment as well. In one fund, for example, Saba proposed allowing stockholders to vote to terminate the management agreement between the fund and its management, as well as authorizing the fund's board to buy back the fund's shares at or close to net asset value. *See* JA 232. This is the same type of conduct Saba says it intends to pursue here.

14

influence by opportunistic traders," like Saba, "pursuing short-term agendas."  JA 723.

Saba's actions easily outdistance mere "some day intentions."  *Defs. of Wildlife*, 504 U.S. at 564.  To satisfy Article III, Saba need not purchase additional shares in a fund whose investment strategy it seeks to challenge only to have the shares encumbered by a voting restriction that would thwart the very challenge Saba hopes to pursue.  Saba's purpose and intent here are clear.

The injury-in-fact requirement exists to "help[] . . . ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'"  *Driehaus*, 573 U.S. at 158 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  Saba, an incumbent investor in the Nuveen funds with a track record of purchasing shares over the 10% threshold, has presented evidence of an "inten[t] to engage in substantially similar activity in the future," and clearly has a personal stake in this litigation.  *Driehaus*, 573 U.S. at 161 (internal quotations and citations omitted) (alterations in original).

Fighting this conclusion, Nuveen cites *Faculty, Alumni, & Students Opposed to Racial Preferences v. New York University* ("*FASORP*"), where our Court held that an organization plaintiff lacked standing to challenge a law school publication's article-selection and editor-selection processes, as well as the law school's faculty-

15

hiring processes, all of which the plaintiff alleged impermissibly considered sex and race. *See* 11 F.4th 68, 73, 78 (2d Cir. 2021). This case is inapposite. In addition to failing to identify any members who suffered harm for organizational standing, the plaintiff also failed to allege a harm that was "certainly impending" or at "substantial risk" of occurring. *Id.* at 76 (citation omitted). The complaint described a "highly attenuated chain of possibilities" because it merely alleged that its members "*intend[ed]* to continue submitting their scholarship" and "*intend[ed]* to apply for jobs at the [l]aw [s]chool," but it did not describe "plans to apply for employment, submit an article, *or of having submitted an article*, that will or [had] been accepted for publication." *Id.* at 77 (internal quotations and citation omitted) (emphasis added).

Saba submits the type of detail we found lacking in *FASORP*. Saba purchased millions of shares in Nuveen's funds from 2018 to 2020 at levels high enough to trigger the Amendment (had it been in place). Saba was on the cusp of triggering the Amendment at the time of its passage and had far exceeded the threshold in prior purchases. And in light of this context, Saba's declaration that "[f]unds managed by Saba, including Saba CEF 1, would have acquired additional shares in the Trusts but for the Vote-Stripping Amendment," is sufficient to

16

establish imminence. JA 20–21. Saba's proof amounts to more than mere "some day intentions" to buy enough future shares to trigger the Amendment. *FASORP*, 11 F.4th at 77 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)).

In a related objection, Nuveen argues that even if Saba purchased enough shares to trigger the Amendment, its injury of being prevented from voting its future shares "depends on a speculative chain of possibilities, including the possible future decisions of independent decisionmakers," *i.e.*, the shareholders, who will have to vote on whether Saba can vote new control shares. Appellants' Br. at 36–38. Under Nuveen's interpretation of the Bylaws, the Amendment does not interfere with an investor's voting rights until *after* the shareholders vote against authorizing them. Nuveen cites *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 144 (2d Cir. 2021), and *Clapper*, 568 U.S. at 414, to argue that Saba's injury is speculative because it "require[s] guesswork as to how independent decisionmakers"—the shareholders—"will exercise their judgment" when they vote on Saba's rights. *Clapper*, 568 U.S. at 413.

The Amendment's text dooms this argument. When an investor makes a Control Share Acquisition, the restrictions contained in the Amendment are self-actuating, restricting voting rights *immediately* and *automatically*. The Amendment

17

is clear: "the beneficial owner of [c]ommon [s]hares acquired in a Control Share Acquisition shall have the same voting rights . . . as the beneficial owners of all other [c]ommon [s]hares . . . *only to the extent authorized* by vote of [s]hareholders at a meeting of [s]hareholders." JA 320 (emphasis added). "If voting rights . . . are not authorized," the investor "shall not be 'entitled to vote.'" *Id.* Thus, the shareholder's right to vote is **automatically encumbered** following the investor's purchase of control shares and until restored by the authorization vote.[7] This could stretch on for a while; at best, an investor could request a special meeting of the shareholders—for which he must pay the expenses—and wait up to fifty days.[8] It is not "guesswork" to say, as Saba does here, that even a temporary removal of voting rights constitutes an injury in fact.

---

[7] Nuveen's counsel conceded at oral argument that as a default rule, owners of control shares do not vote them until subsequently authorized by the shareholders. After making this concession, Nuveen's counsel also asserted that "as a practical matter," before there would be any opportunity to hold a substantive vote, the first order of business at a shareholder meeting would be a vote on whether to authorize the voting rights of the interested control shares. Oral Argument at 10:51–11:30. When asked for a citation for this proposition, Nuveen's counsel directed the Court to Section 9.3 of the Bylaws. However, nothing in Section 9.3 requires Nuveen to first hold a control-share authorization vote with respect to any outstanding control shares before it holds any other substantive vote.

[8] If the investor opted not to pay for a special meeting, she would have to wait until the next annual or special meeting, unless that meeting was already noticed—in that case, presumably, she would have to wait until the meeting after next.

Lastly, Nuveen argues that Saba could avoid any looming uncertainty by first submitting a "bona fide written offer" before buying control shares, which would allow the shareholders to preemptively decide the fate of Saba's future voting rights. It is no answer that Saba can avoid one injury by accepting another—namely, sacrificing its ability to make real-time investment decisions and instead subject itself to weeks or months of Nuveen's onerous (and potentially costly) authorization procedures. Saba's injury is imminent and nonspeculative.

## B. Concreteness

Nuveen construes the ICA's voting protections as insufficient to serve as the basis for a shareholder's concrete injury. As Nuveen argues, "[t]here is no common-law or historical analogue for vindicating Saba's alleged injury—the deprivation of equal voting rights for every share—because restrictions on voting rights were historically the norm" throughout the late eighteenth century and much of the nineteenth century. Appellants' Br. at 32. Nuveen's argument misunderstands the nature of a "concrete injury."

A concrete injury is "real, and not abstract." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). Courts must assess "whether the alleged injury to the plaintiff has a 'close

relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* (quoting *Spokeo*, 578 U.S. at 341). Though "history and tradition offer a meaningful guide," there need not be "an exact duplicate in American history and tradition" to the plaintiff's alleged harm. *Id.* (citation omitted).

This is not to say that Congress in its legislative efforts has no say in the matter; Congress's views are "instructive." *Id.* (citing *Spokeo*, 578 U.S. at 341). "Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *Id.* In imposing these statutory prohibitions, Congress "'elevate[s]' harms that 'exist[ed]' in the real world before Congress recognized them to actionable legal status," though it "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* at 2205 (internal quotation marks and citation omitted). That is to say, a plaintiff must still be actually injured; she must have sustained a concrete injury.

*TransUnion* is illustrative here of gaps that can arise between statutory violations and concrete injuries under Article III. There, two groups of plaintiffs prevailed at trial against a reporting agency for failing to use reasonable procedures to ensure the accuracy of the plaintiffs' credit files, in violation of a federal statute. *See id.* at 2202. There was, however, a significant distinction between the two groups of plaintiffs: the first group's inaccurate credit reports were disseminated to third-party businesses; the reports of the second group were not. *See id.*

Though the federal statute created a cause of action for both groups of plaintiffs to recover statutory and punitive damages, there was "an important difference [] between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* at 2205. In arguing that they suffered a concrete injury "bear[ing] a 'close relationship'" to a harm traditionally recognized at common law, the plaintiffs contended that their injury was analogous to the tort of defamation. *Id* at 2208. The Court agreed, but only with respect to the first group of plaintiffs. Plaintiffs whose credit reports were *disseminated* to third-party businesses demonstrated a concrete injury; the tort of

21

defamation required *publication*, and it was the *publication* of inaccurate credit information that harmed the plaintiffs. *See id.* at 2208–09. For the second group of plaintiffs whose credit reports were *not* disseminated, however, they lacked a concrete injury—the information in their credit reports may have been inaccurate (and in violation of federal law) but the inaccuracy had not caused plaintiffs any injury—it had not been reported to anyone. Their harm was "roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored it in her desk drawer." *Id.* at 2210.

Like both groups of plaintiffs in *TransUnion*, Saba clearly has a statutory cause of action to sue—an injury in law. This Court has held that the ICA provides a private cause of action authorizing a party to a contract that violates the ICA to seek rescission. *See Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 106 (2d Cir. 2019); 15 U.S.C. § 80a-46(b).[9] Saba—an incumbent shareholder in the Nuveen

---

[9] Nuveen does not dispute that our Circuit's precedent allows Saba to pursue relief under the ICA, though Nuveen says it "reserve[s] the[] right" to later challenge our Circuit's law recognizing an implied private right of action under the ICA. Appellants' Br. at 23. Aside from its Article III-related arguments, Nuveen does not separately argue on appeal that the district court lacked statutory authority under the Declaratory Judgment Act to grant a declaratory judgment in favor of Saba.

funds—is a party to Nuveen's Bylaws, and in turn, the Amendment.[10]

Though Saba has an injury in *law*, Nuveen cites *TransUnion* in insisting that the "ICA's codification . . . of the [] one share-one vote standard" cannot be the basis for an injury in *fact*. Appellants' Br. at 43. *TransUnion* is far afield from this case. The plaintiffs in *TransUnion* whose reports were inaccurate but not disseminated incurred no injury because their asserted common-law analogue of defamation required publication; the reporting agency's violation of the statute in failing to follow reasonable procedures to ensure accuracy did not cause concrete harm without dissemination.

Here, Nuveen's statutory violation will cause Saba concrete harm. Saba's "ownership of stock" in the Nuveen funds is a "property interest." *United States v. Wallach*, 935 F.2d 445, 462 (2d Cir. 1991), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023). Likewise, voting rights attached to those shares

---

[10] Nuveen's funds are organized as Massachusetts business trusts, and their Bylaws constitute a contract between Nuveen's shareholders and Nuveen's Board. According to the Bylaws, "[e]ach [s]hareholder of the Trust, by virtue of having become a [s]hareholder, shall be held to have expressly assented and agreed to be bound by the terms of the Declaration of Trust and the[] By-Laws." JA 285; *see also* JA 313 (Bylaws discussing "claims to vindicate a [s]hareholder's *contractual* voting rights") (emphasis added); *ER Holdings, Inc. v. Norton Co.*, 735 F. Supp. 1094, 1097 (D. Mass. 1990) ("The corporate by-laws constitute a contract between the corporation's owners—the shareholders—and its managers, the [b]oard.").

are at the very least analogous to property interests. *See Brown v. McLanahan*, 148 F.2d 703, 708 (4th Cir. 1945) ("The voting strength attaching to shares of stock is as much a property right as any element of dominion possessed by an owner of realty."). Under Nuveen's Amendment, the shares Saba acquires above 10% ownership will be diminished in value because the shares' voting rights will be encumbered.

This "property-based" injury has "a close historical or common-law analogue." *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 341). Saba's injury is analogous to a property-based injury like conversion or trespass to chattels. Conversion is the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel," and "trespass to a chattel" is a related tort that "may be committed by intentionally . . . using or intermeddling with a chattel in the possession of another," when "the chattel is impaired as to its condition, quality, or value." Restatement (Second) of Torts §§ 217(b), 218(b), 222A(1) (Am. L. Inst. 1965). Both are injuries recognized at common law. *See id.* §§ 217 cmt. d, 218, 222A cmt. a.

24

Thus, Saba's injury—that its shares' voting rights will be encumbered—is at the very least analogous to a property-based injury because the Amendment impairs the shares' "condition, quality, or value." Restatement (Second) of Torts §§ 217(b), 218(b) (Am. L. Inst. 1965); *see also Shidler v. All Am. Life & Fin. Corp.*, 775 F.2d 917, 925–26 (8th Cir. 1985) (voting defect depriving shareholders of "basic property right to a meaningful voice in the conduct of corporate affairs" qualified as "injury sounding in the tort of conversion").[11]

In arguing otherwise, Nuveen plainly misunderstands the nature of Article III's historical inquiry, and overlooks the fact that Article III "does not require an exact duplicate in American history and tradition." *TransUnion*, 141 S. Ct. at 2204. Nuveen contends that restrictions on shareholding voting rights were the norm under the common law, and that there was no common-law basis to sue for a lack of equal voting rights for every share. In Nuveen's view, the fact that Congress—

---

[11] Our analysis does not change merely because Saba has not yet purchased any shares affected by the Amendment. Unlike the *TransUnion* plaintiffs, Saba is not suing for "retrospective damages," Saba is suing for recission and a declaratory judgment— "forward-looking" relief "to prevent the harm from occurring." *TransUnion*, 141 S. Ct. at 2210. *TransUnion* acknowledged that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *Id.* Because Saba's risk of harm is sufficiently imminent and substantial, and that harm is concrete, it meets Article III's requirements.

25

or anyone else—did not regulate restrictions on shareholder voting before the ICA means that Saba's injury is not "remotely harmful" *now* because the absence of similar regulation was "custom" back *then*. Appellants' Br. at 43.

That view cabins *TransUnion*'s historical inquiry too narrowly—and conflates injuries in law with injuries in fact. *TransUnion* did not freeze in time all substantive law. Congress frequently "elevate[s] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *TransUnion*, 141 S. Ct. at 2205 (quoting *Spokeo*, 578 U.S. at 341). The question is not, as Nuveen frames it, whether there was always a common-law basis to sue for a lack of equal voting rights for every share—or in other words, an injury in law. The ICA created an injury in law. The correct question is whether there is a "close historical or common-law analogue" for Saba's "asserted *injury*"—its "injury in fact." *TransUnion*, 141 S. Ct. at 2204–05 (emphasis added). As noted above, we hold there is. Saba's imminent injury has a close relationship to a harm recognized at common law; it satisfies Article III's concreteness requirement.

## II. The Legality of Nuveen's Amendment Under the ICA

Saba asserts that Nuveen's Amendment violates 15 U.S.C. § 80a-18(i) of the ICA, which requires that every share of common stock issued by a regulated fund

26

be "voting stock" and "have equal voting rights" with other shares. We agree. The Amendment illegally strips some of Nuveen's shares of voting rights. We affirm the district court's recission of the Amendment and grant of declaratory judgment.

"As in all statutory construction cases, we begin with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). There are two provisions at issue; they are not complex: 15 U.S.C. §§ 80a-18(i) and 80a-2(a)(42). Section 80a-18(i) states, in pertinent part:

> Except as provided in subsection (a)[12] of this section, or as otherwise required by law, every share of stock hereafter issued by a registered management company . . . *shall be a voting stock and have equal voting rights* with every other outstanding voting stock.

15 U.S.C. § 80a-18(i) (emphasis added).

The term "voting stock" is not defined by the ICA. That is where Section 80a-2(a)(42) comes in. That section defines the term "voting security" as "any security *presently* entitling the owner or holder thereof to vote for the election of

---

[12] Subsection (a) is titled "Qualifications on issuance of senior securities" and makes it unlawful for closed-end funds to issue any class of "senior" securities unless certain circumstances not relevant here exist. 15 U.S.C. § 80a-18(a).

directors of a company." *Id.* § 80a-2(a)(42) (emphasis added). "Security" encompasses "stock." *See id.* § 80a-2(a)(36).

Read together, these two provisions of the ICA control. The first provision requires that all shares of stock must be "voting stock" and have "equal voting rights." *Id.* § 80a-18(i). The second defines an umbrella term, "voting security," as one "presently entitling" the owner to vote. *Id.* § 80a-2(a)(42).

The language is plain and unambiguous. In addition to requiring that all investment company stock be voting stock, the statute defines it with reference to its *function*—that it "presently entitles" the owner to vote it. *Id.* § 80a-2(a)(42). Nuveen's Amendment violates this provision because under it, if an owner of Nuveen stock cannot "presently" vote their stock, the stock loses its function and is not "voting" stock. The Amendment also violates Section 80a-18(i) because it deprives *some* shares of voting power but not others—contrary to the provision's guarantee of "equal voting rights." *Id.* § 80a-18(i). A single share acquired by an investor owning 1% of a Nuveen fund's outstanding shares can be voted, but a single share acquired by an investor taking her to 10% ownership could not. The

28

Amendment does not "presently entitle" the second owner to vote; her share is not voting stock and it is not equal to the other shares.[13]

In granting summary judgment for Saba, the district court correctly construed these provisions together. Nuveen argues that the district court made two errors in reaching its conclusion. *First*, it faults the lower court for rejecting a "longstanding" distinction between *share* restrictions and share*holder* restrictions. In Nuveen's telling, the Amendment is a restriction on shareholders, not shares— and is therefore permissible under the ICA. *Second*, Nuveen says that the district court ignored its statutory obligation to interpret the ICA in accordance with the ICA's policy and purposes. We reject both arguments.

## A.    Share-Shareholder Distinction

Nuveen's appeal centers around what it calls a share-shareholder distinction. The Control Share Amendment, Nuveen argues, does not run afoul of the ICA because the Amendment restricts certain shareholders, not shares, and

---

[13] In arguing that the district court imposed a "hyperliteral" interpretation of the word "presently," Nuveen misconstrues the district court's analysis. Contrary to Nuveen's assertions, the district court did not construe the ICA to protect the rights of shareholders to vote their shares "at all times," like for example, at midnight on a Saturday. Rather, the district court held that shareholders must be entitled to vote their shares on equal footing with all other shareholders—in other words, whenever the other shareholders are entitled to vote.

Section 18(i) only speaks to share restrictions. We disagree. First, Nuveen's support for what it calls a "longstanding" share-shareholder distinction is, at the very least, overstated. Nuveen draws the distinction not from Section 18(i) of the ICA itself, but from a handful of cases that, save for one, do not purport to interpret the ICA or any other federal statute.

Nuveen relies on a 1977 Delaware Supreme Court decision that recognized a share-shareholder distinction in the context of a certificate of incorporation's restrictions on the voting rights of concentrated shareholders. *See Providence & Worcester Co. v. Baker*, 378 A.2d 121, 122–24 (Del. 1977). Approving the restrictions, the Delaware court noted that they were "limitations upon the voting rights of the stockholder, not variations in the voting powers of the stock *per se*." *Id.* at 123.

*Baker* was concerned only with whether a certificate of incorporation's provisions resembling Nuveen's Amendment were permissible under *state* law. *See id.* There were two state statutes at issue in *Baker*. The first arguably required that all shares in the same class have equal voting rights. *See id.* at 122. The plaintiff relied on that provision in seeking to invalidate the defendant's voting restrictions. Concluding that it was ambiguous, the court looked to a separate provision under state law that expressly allowed "voting rights of stockholders

30

[to] be varied from the 'one share-one vote' standard by the certificate of incorporation." *Id.* at 123; *see also id.* at 122 n.4 (quoting Del. Code Ann. tit. 8, § 102(b)(1)); *id.* at 122 n.5 (quoting Del. Code Ann. tit. 8, § 212(a)). It was only in reconciling these two provisions—one protecting classes of *shares* and another allowing modification of the rights of share*holders*—that the *Baker* court drew a distinction between the two. *See id.* at 123; *see also Williams v. Geier*, 1987 WL 11285, at *4 (Del. Ch. May 20, 1987) (applying *Baker* to corporation's recapitalization). *Baker* did not recognize a freestanding and universal share-shareholder distinction applicable beyond the laws of Delaware; it must be read within the context of state law.[14] Nuveen does not point to a similar provision of the ICA expressly allowing its Amendment.

Nuveen identifies just one case interpreting federal law that cited Delaware's share-shareholder distinction, *Neuberger Berman Real Estate Income*

---

[14] Nuveen cites a handful of out-of-circuit cases which appear to have extended *Baker* from a rule exclusive to Delaware law towards a generally applicable doctrine. Even so, these cases address non-voting restrictions arising under state law, not the ICA. *See Dynamics Corp. of Am. v. CTS Corp.*, 805 F.2d 705, 708 (7th Cir. 1986) ("Indiana courts normally take their cue from the Delaware courts"); *Georgia-Pac. Corp. v. Great N. Nekoosa Corp.*, 728 F. Supp. 807, 811 (D. Me. 1990) (accepting Delaware law); *Harvard Indus., Inc. v. Tyson*, 1986 WL 36295, at *1 (E.D. Mich. Nov. 25, 1986) (interpreting Michigan law). Here, we interpret federal law, so there is no need to defer to a state court's interpretation of state law.

*Fund, Inc. v. Lola Brown Trust No. 1B*, 342 F. Supp. 2d 371 (D. Md. 2004). There, a Maryland district court examined whether a closed-end investment fund's poison-pill defensive measure violated the ICA. Under that provision, the company's board gave shareholders the right to purchase discounted shares of common stock for each share already owned, but limited control shareholders owning 11% or more of the outstanding common stock in the number of additional shares they could purchase. *See id.* at 374.

The district court declared the poison-pill measure valid under the ICA. Even assuming that *Neuberger Berman*'s embrace of the share-shareholder distinction was correct, however, Nuveen overlooks a key distinction. The poison-pill provision in *Neuberger Berman* affected investors' *economic* interests by differentiating their ability to purchase discounted shares—it did not impair their ability to vote the shares they owned. The district court emphasized this key difference, noting that the provision did not "change the fact that all shares [were] granted equal voting rights," but rather, the reduced ownership interest was "an issue of dilution of economic interest and corresponding voting power," which had "nothing to do with the voting rights of the shares themselves." *Id.* at 376. Nuveen's Amendment, on the other hand, is focused solely on the voting rights of

32

the shares themselves; it prevents control-share owners from "presently" voting their shares on an equal footing with all other shares, in direct contravention of Sections 80a-2(a)(42) and 18(i).

Lastly, Nuveen argues that its share-shareholder distinction is reflected in other provisions of the ICA, namely Section 80a-12(d)(1). This section prevents investment companies from acquiring more than three percent of another investment company's voting stock, but includes an exception so long as the acquiring company votes its stock in accordance with instructions from its clients or in the same proportion as the vote of all other shareholders. *See* 15 U.S.C. § 80a-12(d)(1)(E)(iii)(aa). As Nuveen sees it, this provision is a share*holder* restriction, not a *share* restriction, and evinces Congress's intent to treat the two distinctly under the ICA.

We disagree. Section 12(d)(1) says nothing about the proper interpretation of the ICA's meaning of "voting stock" and "voting security." That Congress has imposed, in another section of the ICA, voting conditions and exceptions on presumptively unlawful acquisitions does not permit Nuveen to impose its own

33

more extreme vote-stripping measures directly at odds with Section 18(i)'s language.[15]

In concluding that the share-shareholder distinction does not carry the day, we do not mean to suggest that Nuveen's Amendment does not also affect shareholders. It affects both the shares and the shareholders, the two are not mutually exclusive. After all, Saba is a shareholder and has been prevented from acquiring additional voting shares and influencing the Nuveen funds' management. To prevail under the ICA, however, Saba need only prove that the Amendment encumbers shares, even if it also affects shareholders. Nuveen's Amendment harms its shareholders by encumbering the shares they own; any distinction between the two is immaterial.[16]

---

[15] For similar reasons, we are not persuaded by Nuveen's reliance on the SEC's implementing regulation, 17 C.F.R. §§ 270.12d1-4(b)(1)(ii)(B), information disclosure requirements for concentrated investors in the Securities Exchange Act of 1934, *see* 15 U.S.C. § 78m(d), or the SEC's 10-day voting suspension rule in 17 C.F.R. § 240.13d-1(e)(2) and (f)(2).

[16] In the alternative, Nuveen argues that even if its Amendment conflicts with the ICA, the district court was obligated under 15 U.S.C. § 80a-46(b)(2) to order factual discovery and weigh the equities before ordering recission. Nuveen forfeited this argument by failing to raise it before the district court. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 50 (2d Cir. 2015). In any event, Nuveen misreads 15 U.S.C. § 80a-46(b)(2). Under that provision, "a court may not *deny* rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a

34

## B.       The ICA's Policies and Purposes

Finally, Nuveen seeks refuge in the ICA's "policy and purposes" section, which it says illustrates Congress's intent to prevent activist investors like Saba from acquiring concentrated ownership interests in investment funds. Nuveen is correct that in passing the ICA, Congress instructed courts to interpret the statute with its "policy and purposes" section in mind—Section 1(b) mandates that "the provisions of [the ICA] shall be interpreted" "in accordance with" its stated policies. 15 U.S.C. § 80a-1(b).

That only gets Nuveen so far. While we "must interpret the [ICA] in a manner most conducive to the effectuation of its goals," *United States v. Nat'l Ass'n of Sec. Dealers*, 422 U.S. 694, 720 (1975), we will not deviate from the statute's plain meaning. Even if Section 18(i) were so ambiguous as to make Congress's policy considerations determinative, they would lean in Saba's favor.

Congress passed the ICA "to provide a comprehensive regulatory scheme to correct and prevent certain abusive practices in the management of investment companies for the protection of persons who put up money to be invested by such

---

more equitable result than its grant and would not be inconsistent with the purposes of this subchapter." *Id.* § 80a-46(b)(2) (emphasis added). Equitable balancing is not required to *grant* rescission.

35

companies [on] their behalf," *i.e.*, the shareholders. *Indep. Inv. Protective League v. Sec. & Exch. Comm'n*, 495 F.2d 311, 312 (2d Cir. 1974). These corrections were "enacted for the benefit of investors," not fund insiders, *Reeves v. Continental Equities Corp.*, 912 F.2d 37, 41 (2d Cir. 1990), and passed primarily to "correct the abuses of self-dealing," which led to the "wholesale victimizing" of shareholders from "fantastic abuse[s] of trust by investment company management," *United States v. Deutsch*, 451 F.2d 98, 108 (2d Cir. 1971).

The ICA's statements of policy reflect Congress's apprehension about certain practices employed by investment companies. Congress expressed concern over, *inter alia*, (i) investment companies that are "organized, operated," and "managed" "in the interest of directors, officers, investment advisers, depositors, or other affiliated persons thereof"; and (ii) investment companies that "issue securities containing inequitable or discriminatory provisions, or fail to protect the preferences and privileges of the holders of their outstanding securities." 15 U.S.C. § 80a-1(b)(2)–(3). It is not clear that Nuveen's Amendment supports these policy objectives by stripping shares of voting rights unequally.[17]

---

[17] We are not persuaded by Nuveen's attempt to characterize any shareholder owning more than 5% of a fund's outstanding shares, like Saba, as an "affiliated person[] thereof"

Nuveen also points to Section 1(b)(4), which reflects Congress's concern over investment companies that are "inequitably distributed" and "unduly concentrated through pyramiding or inequitable methods of control." *Id.* § 80a-1(b)(4). But Congress directly addressed those concerns in other provisions of the ICA—like the provision in Section 12(d)(1), highlighted by Nuveen itself, which restricts investment company acquisitions. *See id.* § 80a-12(d)(1). In short, the ICA's policy and purposes section does not compel us to deviate from the plain text of Section 18(i).[18]

_____

under Sections 80a-1(b)(2) and 80a-2. Section 80a-1(b)(2) warns about the organization, operation, and management of investment companies "in the interest of directors, officers, investment advisers, depositors, or other affiliated persons *thereof*." *Id.* § 80a-1(b)(2) (emphasis added). The fairest reading of affiliates "thereof" in this context means affiliates of *management*, not of other shareholders.

[18] Both parties also draw heavily from reports submitted by the SEC to Congress prior to the ICA's enactment. Though Congress made its findings "upon the basis of facts disclosed by" those SEC reports, 15 U.S.C. § 80a-1(a), the contents of those reports do not compel us to deviate from the statute's plain language. Even a generous reading in Nuveen's favor shows that the SEC Reports expressed two concerns: (i) concentrated investors acquiring control of investment companies with "motives perhaps less compatible with the interests of the stockholders," SEC, Report on Investment Trusts and Investment Companies, H.R. Doc. No. 76-279, at 1021 (1940), and (ii) management's inequitable entrenchment mechanisms, *see, e.g., id.* at 1594–95 (detailing crucial conflicts emerging from investment companies wherein the "general public holding the major part of the senior securities has the greatest stake in the enterprise, while the sponsors or insiders, having a much smaller stake, control the enterprise"). Even assuming some tension between these two concerns, a common overarching theme persists throughout the SEC reports: "[o]f primary importance to the investor is his opportunity to supplant

**CONCLUSION**

We have examined Nuveen's remaining arguments and conclude that they

are without merit.  We **AFFIRM** the judgment of the district court.

---

the management of his investment company when the conduct of those representatives no longer meets with his approval." *Id.* at 1874.